UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3:07-CV-366-H

JEFFREY A. MAINKA                                                              PLAINTIFF

VS.

RAMIUS CAPITAL GROUP, LLC                               DEFENDANT

**MEMORANDUM OPINION AND ORDER**

Plaintiff Jeffery A. Mainka ("Mainka") alleges breach of contract, unjust enrichment, breach of constructive or resulting trust, and demands an accounting against Defendant Ramius Capital Group, LLC ("Ramius"). Ramius has now moved to dismiss, arguing that this Court lacks personal jurisdiction over it. The Court cannot make this decision without further evidence. It does not seem practical in these circumstances to devote discovery solely to jurisdictional issues. Consequently, the Court will deny Ramius's motion at this time.[1]

I.

The Court has not conducted an evidentiary hearing to determine jurisdiction. Therefore, the following factual summary derives from the pleadings and affidavits taken in the light most favorable to Mainka, and without considering Ramius's version of disputed facts. *See Papa*

---

[1] In light of the Court's decision, it also denies Ramius's request to suspend or stay the procedural requirements and general discovery set forth in the Scheduling Order until the Court rules on jurisdiction.

*John's Int'l, Inc. v. Entm't Mktg. & Commc'n Int'l, Ltd.*, 381 F. Supp. 2d 638, 639-40 (W.D. Ky. 2005)(citing *Dean v. Motel 6 Operating L.P.*, 134 F.3d 1269 (6th Cir. 1998)).

Mainka, a resident and citizen of Kentucky, was employed by Churchill Downs Incorporated ("CDI") as Vice President in charge of corporate development and strategic planning from 2001-2006. CDI is a publicly-traded corporation registered in Kentucky with its principal place of business in Louisville. Directors' and shareholders' meetings are held in Louisville. Mainka is currently self-employed as an investment banker and a business and transaction consultant. Ramius, a global investment firm, is a Delaware limited liability corporation with its sole office in New York City.

According to Mainka, after his departure from CDI, he developed an investment strategy that contemplated either purchasing all outstanding CDI common shares or purchasing a significant equity ownership position in CDI in order to maximize the value of CDI's assets. Mainka wanted to provide information on such a strategy to an investment firm in exchange for compensation. He shared his CDI strategy with his colleague, Jonathan Blum ("Blum") who had business contacts with Ramius. On or about February 6, 2007, Blum contacted Jeffrey Smith ("Smith"), a partner in Ramius, to determine Ramius's interest in investing in CDI. Blum later e-mailed Smith a document prepared by Mainka entitled "Project Blinds" which summarized Mainka's stategy. Blum, Mainka, and Peter Feld ("Feld"), an associate at Ramius, then exchanged e-mails and spoke by phone and Feld invited Mainka to New York to meet with Ramius.

At that time, Mainka says he conveyed to Ramius his intent not to provide further information or attend a meeting until Ramius agreed to certain terms for compensating Mainka

for his information. Not surprisingly, the parties disagree as to whether any agreement was ever reached on compensation. They also dispute whether the strategy that Mainka proposed to Ramius was limited to Ramius purchasing CDI in its entirety, or whether the proposal also contemplated a scenario where Ramius would simply buy shares as a public equity investment. Regardless, on February 8, 2007, Mainka e-mailed Feld a document entitled "Summary of Key Terms" which included several compensation options. According to Mainka, during a conversation by phone, he and Feld agreed that Ramius would pay Mainka 11% of Ramius's profits on the acquisition of CDI stock under a scenario involving no change of control of CDI. Mainka requested that this agreement be reduced to writing, and Feld "represented that Ramius would do so immediately following the parties' anticipated meeting."

Mainka, Blum, Feld, and Smith met at Ramius's offices in New York on February 12, 2007. Mainka says once he arrived in New York, Feld and Smith made "express, unqualified representations and assurances" that "Ramius agreed to pay remuneration to Mainka of eleven percent (11%) of all profits made by Ramius and or Ramius' affiliates on investments in CDI." After that meeting, Ramius began purchasing CDI shares, which Mainka says was consistent with the approach the parties discussed on February 12. Ramius, on the other hand, says it had no intention of engaging in the compensation scheme Mainka had proposed and that Ramius did not rely on Mainka's proposed strategy when it acquired CDI shares or later contacted and met with CDI's CEO, Robert Evans ("Evans") in Kentucky.

Following the February 12 meeting, Mainka continued to consult with and provide information to Ramius from Kentucky regarding CDI under the belief that the parties had reached an agreement for his compensation, and despite the fact that Ramius ignored his

3

repeated requests to reduce the agreement to writing. Ramius maintains that during this time it was independently assessing the viability of any investment strategy with CDI and was conducting due diligence to ensure that Mainka's advice would not violate any pre-existing agreements he had with CDI.

In the meantime, Feld and Smith planned a trip to Louisville on March 1, 2007 to meet with Evans, the CEO of CDI. Feld proposed over e-mail that he and Mainka "find a place to chat at the airport hotel or something" while Feld was in Louisville following his meeting with Evans. Mainka e-mailed Feld talking points to prepare Feld for the meeting with Evans. Ultimately, Feld and Smith decided not to travel on March 1 due to bad weather, and instead Evans and Fled spoke by phone. After their conversation, Feld called Mainka to report on the discussion. According to Feld, he and other Ramius employees determined that Mainka's proposal was "not feasible," although CDI remained "a good public equity investment."

Some two weeks later, on March 15, 2007, Feld offered Mainka compensation of 3% of Ramius's net profits on CDI stock, a figure significantly lower than the 11% that Mainka says Ramius had already agreed to pay him. The parties offer varying accounts of how their relationship proceeded over the following month. However, on April 18, 2007, Ramius representatives, including Feld, traveled to Louisville for a face-to-face meeting with Evans and a tour of Churchill Downs. Mainka did not arrange that meeting, and Feld informed him of it only after it occurred. That same day, Mainka e-mailed Feld asking him to "send the agreement which entitles me to 3% of any profits Ramius makes on all CHDN stock purchases." Mainka e-mailed Feld again on April 24, 2007, asking about "next steps to formalizing our agreement." Feld responded by e-mailing a written agreement for 3% compensation, which the parties never

4

executed. This lawsuit followed.

## II.

In considering a 12(b)(2) motion to dismiss, a district court has discretion to hear and determine the jurisdictional issue before trial or to defer hearing evidence and ruling on the motion until trial. *Serras v. First Tenn. Bank Nat'l Ass'n*, 875 F.2d 1212, 1214 (6th Cir. 1989). Ramius asks the Court to rule following an evidentiary hearing and discovery on the matter. However, especially where the disputed jurisdictional facts are "intimately intertwined" with the dispute on the merits, a district court may find it more efficient and fair to rule on the basis of the parties' written submissions and reserve ultimate factual determinations on the jurisdictional issue for trial. *Id.* at 1215; *see also Tucker II v. Nakagawa Sangyo Japan*, 2007 WL 2407236 (W.D. Ky. 2007). When the Court rules on the basis of written submissions, the plaintiff must set forth specific facts making a *prima facie* showing that the court has jurisdiction. *Id.* at 1214. Pleadings and affidavits considered in light most favorable to the plaintiff. *Id.*

In our circumstances, the jurisdictional facts are intimately intertwined with resolution of the parties underlying dispute. Essentially, the parties disagree as to whether they formed an oral agreement which entitled Mainka to 11% of the profits Ramius makes on its purchase of CDI, even if Ramius did not purchase CDI in its entirety. Information regarding the terms and scope of the agreement is also necessary to assess the contractual duties, if any, triggered by Ramius's subsequent acquisition of CDI shares and its discussions and meeting with CEO Evans in Kentucky. Therefore, the Court concludes that the fairest and most efficient way to proceed is to consider whether Mainka's written submissions make a prima facie showing of jurisdiction at this time. The Court reserves the option of finally resolving the jurisdictional dispute after

5

discovery or at trial. *See Serras*, 875 F.2d 1212; *Tucker II*, 2007 WL 2407236.

III.

To determine whether personal jurisdiction exists over a nonresident defendant, the Court applies the law of the forum state subject to the constitutional limits of due process. *CompuServe v. Patterson*, 89 F.3d 1257, 1262 (6th Cir. 1996). Kentucky courts "have determined that 'the long-arm statute within this jurisdiction allows Kentucky courts to reach the full constitutional limits of due process." *Wilson v. Case*, 85 S.W.3d 589, 592 (Ky. 2002). Thus, the Court need only conduct a single due process inquiry. *Tucker II*, at \*2.

Under the applicable portion of Kentucky's long-arm statute provides that "[a] court may exercise personal jurisdiction over a person who acts directly or by an agent, as to a claim arising from the person's . . .[t]ransacting any business in this Commonwealth . . ." Ky. Rev. Stat. Ann. § 454.210(2)(a). The question is whether Ramius has transacted any business in the Commonwealth and whether Mainka's claim "arises" from that transaction. This inquiry is identical to the Due Process Clause requirement that a defendant have "minimum contacts" with the forum "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Ford v. RDI/Caesars Riverboat Casino, LLC,* 503 F. Supp. 2d 839, 843 (W.D. Ky. 2007)(quoting *Int'l Shoe v. Washington*, 326 U.S. 310, 316 (1945)). The Sixth Circuit has laid out a familiar three-part test for determining whether a non-resident defendant has sufficient "minimum contacts":

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*S. Mach. Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir. 1968)(footnote omitted). First, there is limited evidence that Ramius "purposefully availed" itself of the privilege of acting in Kentucky. It has no office, employee, or agent in Kentucky. Nor does it solicit business, have bank accounts, or telephone listings here. Instead, Mainka's claim rests largely on the purported oral contract between Ramius and him, an agreement allegedly negotiated and reached on the phone while Mainka was in Kentucky. Whether an interstate contract can support personal jurisdiction over a nonresident defendant depends on "prior negotiations and contemplated future consequences, along with the terms of the contract and parties' actual course of dealing." *Papa John's*, 381 F. Supp. 2d at 641-42 (quoting *Burger King v. Rudzewicz*, 471 U.S. 462, 479 (1985)).

Here, the only in-person meeting between the parties occurred in New York, and the remaining communication occurred via phone or e-mail while Mainka was in Kentucky and Ramius in New York. Ramius's alleged contractual responsibilities to Mainka were limited to paying him a percentage of Ramius's profits on its investments in CDI, an act which did not require Ramius representatives to come to Kentucky. That Ramius directed communication to Mainka and that Mainka's performance would occur in Kentucky would not, standing alone, support jurisdiction over Ramius. *See id.* at 643 (citing *Calphalon Corp. v. Rowlette*, 228 F.3d 718 (6th Cir. 2000)); *Hillerich & Bradsby Co. v. Hall*, 147 F. Supp. 2d 672, 677 (W.D. Ky. 2001). These factors, without more, would suggest that Ramius is not subject to personal jurisdiction in Kentucky courts. *See, e.g. Spectrum Scan, LLC v. AGM CA*, 2007 WL 2258860 (W.D. Ky. 2007).

Notwithstanding these limited contacts, the subject matter of the alleged contract

involved acquisition, in part or in whole, of CDI, a publicly traded corporation registered in Kentucky with its principal place of business in Louisville. Ramius's interest in a Kentucky corporation and its investment and potential influence in CDI has potentially enduring consequences for the forum. These potential consequences in Kentucky distinguish the facts at hand from cases where this courts found that a contract with an out-of-state defendant is insufficient to confer jurisdiction because the subject matter of the contract does not tie the defendant to the forum. *See, e.g. Papa Johns,* 381 F. Supp. 2d 638; *Spectrum Scan,* 2007 WL 2258860; *Hillerich & Bradsby Co.*, 147 F. Supp. 2d 672; *Calphalon* 228 F.3d 718. In addition, Ramius acquired stock in CDI on the open market and held discussions with CDI's CEO both by phone and in Louisville.

To be sure, a lone trip to the forum may not suffice to support jurisdiction. *See Calphalon,* 228 F.3d 718. Moreover, the mere purchase of stock of a publically traded corporation that happens to be located in Kentucky would also fall short of jurisdictional grounds. However, because Ramius intentionally did both of these things, and because Mainka claims that Ramius agreed to compensate him for information that he provided regarding investment in a Kentucky corporation, the Court believes that Mainka has made a *prima facie* showing that Ramius's contacts with Kentucky were neither "random" or "fortuitous."

At the heart of the parties' dispute is whether Ramius's investment and interaction with CDI triggered a contractual obligation to compensate Mainka. This dispute informs the second factor of the *Southern Machines* test, which asks whether the plaintiff's cause of action arises from the defendant's actions in the forum state. *S. Mach*, 401 F.2d at 381. Again, it is possible that Mainka's claim arises from Ramius's investment in CDI which, and its interactions with

8

CEO Evans, which included a face-to-face in Kentucky. However, to determine the nature of Ramius's relationship with CDI and the quality of its dealings and communications in Kentucky at such an early stage of the proceedings and without the benefit of discovery would be to prematurely resolve an essential element of Mainka's claims.

The final factor of the *Southern Machines* test probes whether the defendant's contacts have a "substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable." *Id.* As outlined above, Ramius's contacts with Kentucky appear to be limited to a single visit to Louisville, communications directed to a Kentucky citizen, the acquisition of the stock of a corporation registered in Kentucky, and alleged oral contract with a Kentucky citizen. These are not extensive contacts. However, Kentucky has an interest in protecting the contract rights of its citizens, especially where the subject matter of the agreement involves significant investment in a Kentucky corporation. Upon review of the pleadings and affidavits in the light most favorable to Mainka, the Court finds that he has made a *prima facie* showing of a substantial enough connection to Kentucky for jurisdiction over Ramius to be reasonable.

Because, in this case, the jurisdictional facts are so intertwined with the facts necessary to prove Mainka's case-in-chief, the Court declines Ramius's proposal to hold an evidentiary hearing on the jurisdictional issue after discovery limited to that question. Most, if not all, of the discovery necessary to prove Mainka's claims will also be helpful to the Court in finally resolving the jurisdictional dispute. Here, an attempt to narrow discovery to jurisdictional issues would be difficult and inefficient. However, Ramius has not waived its personal jurisdiction defense, and, prior to trial, Mainka must prove jurisdiction by a preponderance of the evidence.

*Serras,* 875 F.2d at 1215.

Being otherwise sufficiently advised,

IT IS HEREBY ORDERED that Defendant's motion to dismiss and suspend further proceedings is DENIED at this time.

cc: Counsel of Record